**UNUM LIFE INSURANCE COMPANY OF AMERICA, Plaintiff,**

v.

**Janis CAPPELLO, Defendant.**

**No. C.A.01–252S.**

United States District Court,
D. Rhode Island.

Aug. 18, 2003.

Brooks R. Magratten, Esq., Vetter & White, Providence, RI, for Plaintiff.

Michael P. Robinson, Esq., Stephen M. Robinson, Esq., Law Offices of Stephen M. Robinson, Esq., Providence, RI, for Defendant.

## DECISION AND ORDER

SMITH, District Judge.

While an employee of Allendale Mutual Insurance Company ("Allendale"), Defendant Janis Cappello ("Cappello" or "Defendant") participated in an employee welfare benefit plan[1] that included long term dis-

---

1. The Employee Retirement Income Security Act ("ERISA") defines an employee welfare benefit plan as:

ability ("LTD") benefits. Allendale's LTD benefits were funded by a group insurance policy (the "Plan") issued by Plaintiff Unum Life Insurance Company of America ("Unum"). In late August of 1996, Cappello was injured when she slipped and fell at Boston's Logan International Airport. In April of 2000, Cappello sought LTD benefits as a result of those injuries. This case concerns Unum's refusal to honor her claim.

On May 16, 2001, Unum initiated this action seeking, pursuant to 29 U.S.C. § 1132(a)(3) [2], a declaration that (1) LTD benefits under the Plan are barred by a general release signed by the Defendant; (2) LTD benefits are not payable under a conversion policy issued by Unum directly to Cappello; and (3) Unum has complied with its duties under 29 U.S.C. § 1001, *et seq.*, in regard to Cappello's claim.

On August 7, 2002, U.S. Magistrate Judge Robert W. Lovegreen issued a Report and Recommendation ("R & R") that recommended granting Unum's Motion for Summary Judgment with respect to Cappello's entitlement to LTD benefits under a conversion policy. However, Magistrate Judge Lovegreen denied Unum's Motion for Summary Judgment as to whether Cappello's LTD benefits under the Plan were barred, and whether Unum had complied with the strictures of ERISA. On September 16, 2002, U.S. District Judge Ernest C. Torres adopted Judge Lovegreen's R & R. Consequently, this Court [3] held a bench trial on May 15, 2003, on the limited issue of whether a general release signed by the Defendant subsequent to her injuries—and following the execution of a severance agreement and release—extinguishes her ability to recover LTD benefits under the Plan. For the reasons that follow, this Court finds that Cappello's claims are not barred.

## I. Findings of Fact

From 1975 through 1999, Cappello was an employee of Allendale. She had attained the position of Assistant Vice President of the Underwriting Staff by the time she left Allendale's employ. While an Allendale employee, Cappello elected to par-

---

[A]ny plan ... or program which was ... established or maintained by an employer, or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants ..., through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services....

ERISA § 3(1), 29 U.S.C. § 1002(1)(2000).

**2.** 29 U.S.C. § 1132 states in pertinent part:

(a) Persons empowered to bring a civil action

A civil action may be brought—

(1) by a participant or beneficiary—

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title.

**3.** Chief Judge Torres transferred this case to the docket of U.S. District Judge William E. Smith on December 3, 2002.

ticipate in its employee welfare benefit plan, which included LTD benefits. The LTD benefits were funded by Unum, and Unum served as the Plan Fiduciary and the Claims Administrator.

On August 24, 1996, Cappello tripped and fell on a handicap ramp at Boston's Logan International Airport while returning from a business trip. Cappello testified that "I felt my stomach go up into my head and my whole entire right side of my body was trembling. I knew I had done something very bad." She suffered injuries to her right hip and arm, severe back spasms, as well as neck pain and loss of feeling in her hands. Despite surgery and a substantial amount of medical treatment, Cappello suffered the effects of her injuries for years to come, but continued to work at Allendale.

In the spring of 1999, Cappello became aware that Allendale was positioning itself to merge with FM Global Insurance Company. Despite attempts to maintain her current position in what would become the post-merger insurance company known as FM Global, Cappello was informed that her position would be eliminated. In April of 1999, prior to completion of the merger, Cappello stopped working due to her injuries and the eventual elimination of her current job position. At that time, George Cappello, the Defendant's husband and a Rhode Island attorney, began negotiations with Allendale regarding Cappello's severance package. These negotiations occurred between April 1999 and August 1999.

During the negotiations, George Cappello alleged that Allendale had subjected his wife to discrimination and intentional infliction of emotional distress by eliminating her job position. In order to resolve these allegations and eliminate the outstanding severance package issue, Allendale requested that Cappello sign an Agreement and General Release ("Agreement") in order to receive her severance package. The Cappellos, however, testified that they were concerned about signing such a broad, general release due to Cappello's lingering health issues. As a result, the Cappellos negotiated a provision to be included in the Agreement that would preserve her right to seek workers' compensation benefits in the event it became necessary. The Agreement, however, did not explicitly preserve, or eliminate, Cappello's right to seek LTD benefits. Allendale's General Counsel, John Pomeroy, testified that Allendale's primary concern in negotiating the Agreement was Cappello's threat of litigation, and that her ability to pursue LTD benefits was "not a major concern."

On July 23, 1999, Cappello signed the Agreement.[4] As consideration for Cappello's execution of the Agreement, Factory Mutual Insurance Company[5] agreed to pay Cappello over $140,000 in severance benefits over a period of ninety-six weeks beginning in September 1999. In return, Cappello released Factory Mutual from all claims "known, unknown, unanticipated or undisclosed" that she had or may have had as of the date of the Agreement. Factory Mutual and Cappello were the only parties

4. The signature page indicates that Cappello signed the Agreement on July 23, 1999. However, at trial Cappello testified that she had accidently utilized July 23, her birthday, as the date instead of the actual date she signed the Agreement, which was sometime in August of 1999. Because it finds the difference in dates insignificant to the issues before

it, the Court will utilize the date memorialized in the Agreement.

5. Allendale and FM Global officially merged on July 1, 1999. The new entity was named Factory Mutual Insurance Company ("Factory Mutual").

to sign the Agreement. The opening paragraph of the Agreement reads as follows:

> FACTORY MUTUAL INSURANCE COMPANY its affiliates, predecessors, successors and assigns, and the directors, officers, employees, plan fiduciaries, and agents thereof collectively ("FMIC"), and JANIS M. CAPPELLO ("Employee") agree to enter into this Agreement and General Release as follows....

See Plaintiff's Ex. 17. The Agreement specifically included ERISA-based claims. Cappello testified that she never intended to release Unum when she entered into the Agreement with Factory Mutual. In fact, George Cappello testified that LTD benefits were never discussed with either the Defendant or with Factory Mutual during negotiation of the Agreement.

On June 3, 2000, Cappello submitted a claim for LTD benefits under the Plan.[6] On June 6, 2000, a benefit specialist at Unum notified Factory Mutual of Cappello's LTD claim. On June 19, 2000, Factory Mutual informed Unum that it believed Cappello's claim was barred by the Agreement. Unum subsequently denied Cappello's LTD claim under the Plan. After receiving numerous letters from Cappello's legal counsel regarding the denial of her claim, Unum initiated this action on May 16, 2001.

## II.  Conclusions of Law

### 1.  Choice of Law

■ As an initial matter, the parties spar over the law that this Court should apply to its interpretation of the Agreement. Unum contends that federal common law governs the interpretation of the Agreement because it purports to extinguish rights protected under ERISA. Cappello, however, contends that Rhode Island contract law should be utilized to interpret the language of the Agreement.

The August 7, 2002 Report and Recommendation ("R & R"), without discussion of the applicability of federal common law, applied Rhode Island law to determine the scope of the Agreement. In its Objection to the R & R, Unum argued that the Magistrate Judge should have applied federal common law because of the Agreement's implication of ERISA rights. In adopting the R & R, Chief Judge Torres left the choice of law question unresolved by holding that "even if federal common law is applied to determine the validity of the [Agreement] ..., there is still a question of fact regarding the effect of the release." Since the issue has been left unresolved, and because it is arguably important to the outcome of this case, this Court must therefore determine which law will guide its interpretation of the Agreement.

The First Circuit has held on a number of occasions that settlement agreements purporting to release ERISA-based claims shall be construed under federal common law. Morais v. Central Bev. Corp. Union Employees' Supplemental Retirement Plan, 167 F.3d 709, 712 (1st Cir.1999); Smart v. Gillette Co. Long–Term Disability Plan, 70 F.3d 173, 178 (1st Cir.1995); Rodriguez–Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 585 (1st Cir. 1993). While state law often provides federal courts interpreting such settlement

---

**6.** Prior to filing this claim for LTD benefits under the Plan, Cappello sought LTD benefits under an individual, conversion policy that she had purchased after leaving Allendale. Unum denied her claim under the conversion policy, however, because of a preexisting injury limitation. Cappello sued over the denial of this claim as well, but Chief Judge Torres granted summary judgment in favor of Unum with respect to that claim on September 16, 2002.

agreements with a source of law for contract interpretation, the courts properly apply federal case law as opposed to individual states' common law rules of contract interpretation. *Rodriguez–Abreu*, 986 F.2d at 585 (citing *Sampson v. Mutual Benefit Life Ins. Co.*, 863 F.2d 108, 110 (1st Cir.1988)).

In this case, the Agreement clearly purports to govern ERISA-based claims. Furthermore, because the Agreement affects Cappello's ability to obtain LTD benefits, an ERISA-protected benefit, any interpretation of the Agreement clearly affects ERISA-based claims. *See* 29 U.S.C. § 1002(1)(A)(stating that any welfare benefit plans that provide disability benefits are covered by ERISA). In fact, the language of the Agreement specifically states that it intends to include ERISA-based claims. Accordingly, this Court shall apply federal common law to guide its interpretation of the Agreement.

### 2. *Interpretation of the Agreement*

■ In construing the terms of contracts that are governed by federal common law, this Court is guided by "common-sense canons of contract interpretation." *Smart*, 70 F.3d at 178 (quoting *Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486, 489 (1st Cir.1989)). The canon that this Court must initially observe is that contracts containing unambiguous language must be construed according to their plain and natural meaning. *See Burnham*, 873 F.2d at 489. The First

Circuit has held that a contract provision will be considered ambiguous when its "terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Smart*, 70 F.3d at 178 (quoting *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1083 (1st Cir.1989)). Only when a court determines that a contract provision is ambiguous may it resort to extrinsic evidence to determine the parties' true intent. *See id.*

In this case, however, the Court need not make such a determination. In its September 16, 2002 Order adopting Judge Lovegreen's R & R, the Court, through Chief Judge Torres, held that there was a question of fact regarding the effect of the release. Because this Court is bound by this previous ruling, it would be futile (and improper) to engage in an assessment of the ambiguity of the Agreement.[7] Accordingly, the Agreement is ambiguous as to whether the parties intended to release Cappello's ability to bring a claim for LTD benefits, and this Court will resolve that ambiguity.

To do this, the Court may turn to extrinsic evidence to determine the parties' intent. As the First Circuit has indicated, "[e]xploring the intent of contracting parties often (but not always) involves marshalling facts extrinsic to the language of the contract documents. When this need arises, these facts, together with the rea-

---

7. Unum, both at trial and in its post-trial brief, continued to argue that the Agreement is unambiguous. Even if this Court agreed with Unum, however, it would be unwilling to depart from the Court's previous ruling in light of the law of the case doctrine. *See Ellis v. United States*, 313 F.3d 636, 648 (1st Cir.2002)(holding that neither doubt about the correctness of a predecessor judge's rulings, nor a belief that a litigant may be able to make a more convincing argument the second

time around suffices to justify reconsideration). The Court's prior determination of ambiguity is neither a manifest injustice, nor dicta unworthy of this writer's deference. *See id.; Bull HN Information Sys., Inc. v. Hutson*, 229 F.3d 321, 326 n. 3 (1st Cir.2000). The determination was clearly set forth by the Magistrate Judge, and then adopted by the District Court, when it held that genuine issues of fact precluded entry of summary judgment in Unum's favor.

sonable inferences extractable therefrom, are together superimposed on the ambiguous words to reveal the parties' discerned intent." *Smart,* 70 F.3d at 178.

When a waiver of ERISA benefits is implicated, any evaluation of the parties' intent must ensure that it reflects the purposeful relinquishment of an employee's rights. *Id.* at 181; *Finz v. Schlesinger,* 957 F.2d 78, 81 (2d Cir.1992); *Carrabba v. Randalls Food Markets, Inc.,* 145 F.Supp.2d 763, 771 (N.D.Tex.2000). In other words, in order to be effective, agreements such as the one at issue in this case must, at a minimum, be "knowing and voluntary." *Rodriguez–Abreu,* 986 F.2d at 587. Accordingly, the First Circuit has set forth a number of factors, which are not exclusive, that a court may consider when determining if a waiver of ERISA benefits has been "knowing and voluntary": (1) the plaintiff's education, business experience, and sophistication; (2) the parties' respective roles in deciding the final terms of the arrangement; (3) the agreement's clarity; (4) the amount of time available to the employee to study the agreement before acting on it; (5) whether the employee had independent advice—such as the advice of counsel—when she signed the agreement; and (6) the nature of the consideration tendered in exchange for the waiver. *See Smart,* 70 F.3d at 181 n. 3; *Finz,* 957 F.2d at 82. However, only an inquiry that considers the totality of the circumstances behind the waiver can determine its legitimacy. *See Smart,* 70 F.3d at 181 ("Generally, no single fact or circumstance is entitled to talismanic significance on the question of waiver. Only an inquiry into the totality of the circumstances can determine whether there has been a knowing and voluntary relinquishment of an ERISA-protected benefit."). Therefore, to determine the parties' intent in this case, the Court will examine the Agreement as a whole in light of all the circumstances surrounding its formation.

### A. The sophistication of the employee

This case clearly involves a sophisticated business person. Before her position was eliminated by Factory Mutual, Cappello had been employed by Allendale for approximately twenty-four years. Additionally, this Court notes that not only is twenty-four years a substantial amount of time, but also that her employment was in the insurance business, a business area involving complex, and often arbitrary, rules and contractual provisions.

### B. The parties' roles in drafting the Agreement

At all times, Cappello, either herself or through her attorney and husband, was actively involved in the drafting of the Agreement. The evidence shows that the Cappellos made several changes to the initial drafts of the Agreement prepared by Factory Mutual's counsel. *See* Pl.Ex. 13–16. While some of the changes were merely clerical in nature, others were highly substantive. For example, due to concerns over the Defendant's health, the Cappellos requested that a provision be added to the Agreement that would allow the Defendant to seek workers' compensation benefits. Additionally, the Cappellos replaced the term "Allendale" with "FMIC."

On the other hand, Unum had absolutely no involvement in the drafting of the Agreement. In fact, Unum is not even mentioned in the Agreement, nor is it a signatory, nor is there any evidence suggesting it even knew of the Agreement.

### C. The Agreement's clarity

This factor presents a more substantial hurdle for Unum. The Agree-

ment's introductory paragraph states that "FACTORY MUTUAL INSURANCE COMPANY its affiliates, predecessors, successors and assigns, and the directors, officers, employees, plan fiduciaries, and agents thereof collectively ("FMIC"), and JANIS M. CAPPELLO" entered into the Agreement. *See* Pl.Ex. 17. It is undisputed that Unum was not a party to the Agreement.

Unum contends that the term "plan fiduciaries" in the second line of the Agreement's introductory paragraph was meant to include ERISA plan fiduciaries, including Unum, within the scope of the Agreement. The Cappellos, however, testified at trial that they believed the term meant nothing more than Allendale. Cappello also testified that she did not have any reason to believe that the term "plan fiduciaries" was intended to include third parties such as Unum.

Unum argues that the term "plan fiduciaries," when read in conjunction with a provision in the release that specifies that ERISA-based claims are extinguished by the Agreement, makes clear that Cappello's right to collect disability benefits from Unum was extinguished when she entered into the Agreement with her former employer. Unum therefore argues that the "unmistakable effect" of the Agreement was to accomplish a complete and total separation of the employer (including Unum) and Cappello. This Court can not read the Agreement as Unum suggests.

Even considering Cappello's level of sophistication and role in drafting the Agreement, the more reasonable reading of the Agreement is the one suggested by the Cappellos. While the term "plan fiduciaries" is included in the Agreement, it only appears as one of a number of descriptive terms following "Factory Mutual Insurance Company." Both the Cappellos and representatives from Factory Mutual testi-

fied that during negotiations neither side contemplated releasing Cappello's right to seek LTD benefits. In fact, Pomeroy, Allendale's attorney, testified that he was not even aware of the amount of Cappello's entitlement under the LTD policy during the negotiations. Furthermore, Unum's contention that the parties understood that LTD benefits would be extinguished by the Agreement is weakened by the fact that Factory Mutual continued to deduct LTD premium payments from Cappello's paycheck after the parties had entered into the Agreement. Therefore, this factor does not support Unum's contention that the parties intended the Agreement to release Cappello's right to seek LTD benefits.

### D. Amount of time to review the Agreement and advice of counsel

The balance tips in Unum's favor with respect to these factors. While the record is unclear as to the exact amount of time that Cappello had to review the Agreement, this Court has no doubt that she had adequate time to review its contents before signing it. The parties went through a number of drafts of the Agreement, and both sides had ample opportunity to make revisions or negotiate its terms.

Additionally, Cappello was represented by a lawyer throughout the entire negotiation of the Agreement. The evidence established that Cappello's attorney actively negotiated specific provisions of the Agreement, including terms ensuring that Cappello could seek workers' compensation benefits. Therefore, these factors clearly weigh in Unum's favor.

### E. The Nature of the Consideration

At trial, Pomeroy testified that Allendale traditionally calculated the amount of severance benefits with a formula that considered the employee's years of service and

annual salary during that service. In Cappello's case, the severance amount, approximately $140,000, was nearly double the amount given to other employees that were terminated. Pomeroy testified that Cappello was offered a larger sum due to the threat of litigation attending her termination.

The consideration in this case, taken alone, is not an insubstantial sum. However, when considered in light of Cappello's twenty-four years of service and the threat of litigation that Allendale was seeking to extinguish, Unum's contention that the consideration was also intended to extinguish Cappello's entitlement to LTD benefits is dubious. George Cappello was clearly concerned about the health of his wife, which is evidenced by his negotiation of the Agreement's workers' compensation exception. While the exact amount of LTD benefits to which Cappello would have been entitled is unclear, it is likely that the amount would have been substantial based on the severity of her injury and current age. Accordingly, this Court finds that the value of the consideration Cappello received in this case does not match what Unum contends she waived by entering into the Agreement.

After reviewing the Agreement in light of the *Smart* factors, this Court holds that the Agreement does not bar Cappello's ability to collect LTD benefits. Despite the fact that she was represented by counsel and had ample time and opportunity to read the Agreement, the evidence is indisputable that neither party gave any thought to the LTD benefits provided by Unum when they negotiated and signed the Agreement.

### 3. *Unum's Entitlement to Remand*

Unum contends that the Court should remand the matter so that it may investigate and evaluate Cappello's entitlement to LTD benefits. This Court agrees. The only action Unum has taken as of this point is to deny Cappello's claim based on the existence of the Agreement. Unum is entitled, as plan administrator, to conduct an evaluation as to whether Cappello is otherwise entitled to receive LTD benefits under the Plan. *See generally Recupero v. New England Telephone and Telegraph Co.*, 118 F.3d 820, 827 (1st Cir.1997).

### III. *Conclusion*

For the foregoing reasons, this Court finds that Defendant Janis Cappello's ability to seek long term disability benefits from Defendant Unum Life Insurance Company of America is not barred by the Severance Agreement and Release. Accordingly, judgment is entered in favor of Defendant Janis Cappello. This Court further orders that the matter be remanded to Unum Life Insurance Company of America for further investigation into the Defendant's entitlement to long term disability benefits. This Order shall not become final, and judgment shall not enter, until all issues involved in this litigation are fully adjudicated.

IT IS SO ORDERED.